LIGGETT DRUG COMPANY, INC. *vs.* LICENSE COMMISSIONERS OF THE CITY OF NORTH ADAMS.

J. J. NEWBERRY CO. *vs.* SAME.

LIGGETT DRUG COMPANY, INC. *vs.* LICENSE COMMISSIONERS OF THE CITY OF NORTH ADAMS & another.

J. J. NEWBERRY CO. *vs.* SAME.

Berkshire.    October 5, 1936. — November 16, 1936.

Present: RUGG, C.J., CROSBY, FIELD, & LUMMUS, JJ.

*License. Common Victualler. Constitutional Law*, Police power. *Mandamus. Practice, Civil*, Report.

A petition for a writ of mandamus directing a licensing board to issue a license to the petitioner after the board had considered and had refused his application, can be maintained only if the petitioner proves that in the circumstances issuance of the license was required as a matter of law.

Exceptions, saved by the petitioner at the hearing of a petition for a writ of mandamus, where the record set forth correct rulings of law by the single justice and that he dismissed the petition without stating facts found by him, must be overruled if on the evidence reported and in accordance with such law, there might have been found facts which justified the dismissal of the petition.

The provisions of G. L. (Ter. Ed.) c. 140, § 2, authorize licensing authorities in the exercise of sound judgment as to the "public good" to determine whether any licenses as common victualler shall be granted in their respective communities, and, if any, how many; and are constitutional as a valid exercise of the police power.

Under G. L. (Ter. Ed.) c. 140, § 2, it was lawful for the licensing board of a city acting in good faith to deny an application for a license as a common victualler on the ground that the place of business of the applicant was unsanitary and not suitable for the preparation and sale of food, or that the applicant's method of conducting his business by serving food in a room where the sale of merchandise was in progress was detrimental to the public health, or that too many places had been licensed for public eating houses in the city, or that the methods of business of the applicant had a tendency to lower the quality of food dispensed at public eating places in the city generally.

TWO PETITIONS, filed in the Supreme Judicial Court for the county of Berkshire on December 26, 1935, for writs of mandamus directing the respondent board to issue licenses as common victuallers to the petitioners; also

TWO BILLS IN EQUITY, filed in the same court on July 16, 1936, seeking to restrain the defendants from interfering with the plaintiffs in the business of preparing and selling foodstuffs on their respective premises.

The mandamus proceedings were heard by *Pierce*, J. The following requests by the petitioners for rulings were denied:

"If and so far as G. L. (Ter. Ed.) c. 140, § 2, allows the licensing authorities to refuse to grant common victualler's licenses to applicants for reasons other than those affecting the applicant's ability and willingness to cook, prepare and serve food to strangers, travelers, and the public, including therein having the proper implements and facilities on the premises for so doing, or to conduct such business in a legal and proper manner, said statute is unconstitutional and void both under the Constitution of Massachusetts, and the Fourteenth Amendment to the Constitution of the United States."

"So far as G. L. (Ter. Ed.) c. 140, § 2, allows local licensing authorities to set up their own standards as to what the 'public good' does or does not require, and to grant or refuse accordingly, licenses to do business as common victuallers, said section is unconstitutional, both under the Constitution of Massachusetts, and the Fourteenth Amendment to the Constitution of the United States."

"For a licensing board to refuse a license as a common

victualler to a petitioner, otherwise qualified, because the board thinks that there already are enough common victuallers in the city, is improper and illegal."

Action by the single justice on other requests is described in the opinion. He ordered the petitions dismissed. The petitioners alleged exceptions.

The defendants demurred to the bills in equity. The demurrers were heard by *Qua*, J., who reserved and reported the questions raised thereby.

*W. T. Snow*, (*C. S. Maddock* with him,) for the petitioners and plaintiffs.

*P. J. Ashe & W. F. Barrington*, for the respondents and defendants, submitted a brief.

RUGG, C.J. Liggett Drug Company, Inc., and J. J. Newberry Co., corporations organized under the laws of Delaware and for convenience called petitioners, each brought a petition for a writ of mandamus and a suit in equity against the three members of the public board constituting the "licensing authorities" of the city of North Adams as these words are defined in G. L. (Ter. Ed.) c. 140, § 1, and hereafter called respondents. All four proceedings relate to applications by the petitioners for licenses as common victuallers in the city of North Adams for 1936. Each petitioner for the writ of mandamus seeks to have the respondents directed to issue to it a license as a common victualler for 1936. Each petitioner as plaintiff in its suit in equity seeks to have the respondents, with whom the chief of police of North Adams is joined as a party defendant, enjoined from enforcing against it certain provisions of G. L. (Ter. Ed.) c. 140, or interfering with the petitioner's business as a common victualler, on the ground that such provisions are unconstitutional. The proceedings arise out of the refusal of the respondents to grant to each petitioner a license as a common victualler in North Adams for 1936. The respondents filed in substance the same answer to each petition for a writ of mandamus. These petitions were heard upon oral testimony and other evidence by a single justice, who, subject to the exception of each petitioner, denied certain requests for rulings presented

by each petitioner and made certain rulings and dismissed each petition on the merits. The respondents demurred to each bill in equity. At the request of the parties, the questions raised by the demurrers were reported without decision. The inherent authority of a justice of this court to make such report cannot be doubted. *Terry* v. *Brightman,* 129 Mass. 535, 537. *Campbell* v. *Justices of the Superior Court,* 187 Mass. 509, 510. *Riverbank Improvement Co.* v. *Chapman,* 224 Mass. 424, 425.

Each of the petitioners invokes the writ of mandamus to compel the respondents as public officers to issue to it a license as a common victualler. The function of that writ in such circumstances is to compel a board of public officers to perform their official duty according to law. It does not direct what decision shall be made, especially where the element of discretion is involved. Since the respondents have already considered the application of each petitioner and have denied it, each petitioner, in order to prevail, must show that as matter of law it is entitled to such license, or that in refusing to grant the license the respondents have proceeded upon grounds erroneous in law or have otherwise violated legal rights of the petitioner. *Crocker* v. *Justices of the Superior Court,* 208 Mass. 162, 164–165. *Knights* v. *Treasurer & Receiver General,* 236 Mass. 336, 337. *Milton* v. *Auditor of the Commonwealth,* 244 Mass. 93, 96. *Madden* v. *Election Commissioners of Boston,* 251 Mass. 95, 101.

The single justice, after hearing, simply dismissed the petitions but made no findings of material facts. The cases come before us on exceptions, which contain all the facts and evidence necessary for the determination of the questions of law raised. The general finding of the single justice in favor of the respondents imports a finding of all the incidental and subsidiary facts necessary to that conclusion permissible on the evidence. *Blake* v. *Hammersley,* 288 Mass. 247, 249. The question presented on this branch of the case is whether the decision of the single justice can be supported as matter of law upon any rational view of the evidence. That decision is not reviewed or revised,

but is conclusive if supported by evidence. *Andrews* v. *Registrars of Voters of Easton*, 246 Mass. 572, 576. *Moss* v. *Old Colony Trust Co.* 246 Mass. 139, 143. *Swift* v. *Registrars of Voters of Quincy*, 281 Mass. 271, 284.

Facts are stated in each bill of exceptions in substance as follows: Each of the petitioners was authorized by its charter to carry on its business including the selling and dealing in food, food products and drink. Each had fully complied with all the requirements of the law of this Commonwealth as to the doing of business here by foreign corporations. Each for several years had operated a store upon premises in North Adams leased by it and had been licensed as a common victualler. Each maintained a soda fountain, where it sold soft drinks, ice cream and food, including sandwiches, eggs, meat and fish. Each served meals during the midday hours, and one also served meals from five to seven o'clock in the afternoon. Each owned and used in the conduct of its business as common victualler the ordinary and necessary equipment for preparing, cooking and serving meals, that of one being of the estimated value of $4,000 and that of the other of $2,500. One sold at its store among other things medicines, drugs, toilet articles, rubber goods, cigars and cigarettes. The other was a department store of the five, ten and twenty-five cent variety and sold among other things dry goods and general merchandise. One maintained its kitchen in the basement of its store and the other had enlarged its premises by the addition of a kitchen in the rear of its store. One operated eighty-five stores in this Commonwealth and four hundred fifty in the country; the other operated thirty-one stores in this Commonwealth and four hundred fifty-six "all told."

At no time prior to January 1, 1936, had there been any complaint from the board of health or the respondents with respect to the manner in which the business of either petitioner had been conducted.

The following records of the respondents were in evidence: A vote was passed by the board with respect to the Liggett Drug Company, Inc., and J. J. Newberry Co.

on December 14, 1935, reading as follows: "And after taking into consideration all of the angles under Chapter 140 and in consideration of the foregoing the following motion was made: That the applications of the Liggett Drug Company and of the J. J. Newberry Co., when received, for a common victualler's license, be denied on the ground that the public good did not require it and that serving of meals in the same room where the sale of merchandise is actively carried on is detrimental to the public health." Under the same date was this record: "The board feels also that on account of so many common victualler's licenses, consideration should be given to those who do a regular restaurant business and nothing else, and have expensive equipment and pay the city extra money in taxes and license fees, and so forth." There was also this notation on the record book of the respondents concerning Liggett Drug Company, Inc., under date of December 14, 1935: "Place of service, poor. So-called kitchen in cellar where food was prepared and sent upstairs by dumb lift. Day light very poor."

One of the respondents testified in part as follows: "Prior to denying the license the board had certain information concerning the physical aspects of the two premises. This information was confirmed by an inspection made after the proceeding was commenced. With regard to the Liggett store, the portion of the cellar in which food was prepared was not partitioned off from the storage spaces and the rest of the cellar, and a sink and an open trap near the sink down which waste water came was in the cellar, which waste water emptied into the trap and was carried off through the sewer . . . . The inspection confirmed the opinion of the board with regard to sanitary conditions which were considered unfavorable for the preparation of food. There is no daylight in the cellar and the ventilation was very poor. The character of the food was limited, there was no stock of fresh meats and the store room contained mostly canned material. There was a toilet at the foot of the stairs about five feet from the sewer pipe which ran directly into the drain pipe from the sink. It confirmed

the opinion that we had that the sanitary conditions were not right for the preparation of food and that fact was to be considered as a vital fact in coming to that opinion. In addition, the board felt that to serve food in a drug store with all sorts of drugs and possibly poisons and acids and so forth was not proper, where people were coming in and general merchandising was being carried on. The board needed to consider the number of licenses in North Adams because under the conditions of today it felt that the number was seriously handicapping each one of them that was doing business and that it was decreasing their business. The board also felt and took into consideration in reaching its conclusion that Liggett and Newberry were selling meals at very nominal sums and in this way were forcing competitors to curtail the quality of their goods. The question of the excess number of licenses in North Adams and the way to deal with them had been before the board as a major question for several months, and these two particular applications had been discussed on several occasions. . . . One of the main reasons for the refusal of the board to renew the licenses of Newberry and Liggett was that it was thought that there were too many persons or establishments having common victualler's licenses in North Adams and another reason was that it was felt that these establishments were selling goods at too low a price. Another reason was that the board did not feel concerns whose main business was not the sale of food should have such licenses." Another of the respondents testified in part in substance in these words: "The place in which the Liggett store is located is in the main central part of the city as is also the case of the Newberry store, and there are already sufficient licenses for common victuallers in that section to accommodate all the public needs . . . Another reason is that fact that these are the only two holders of common victualler's licenses where other business is carried on in the same premises . . . There were at least forty licenses in 1934–35. The board has felt that there were altogether too many licenses, not only victuallers but liquor licenses also; too many restaurants and too many eating

places in town.  There are ample restaurants in the business for the sole purpose of dispensing food, without granting licenses to other stores in other lines of business.  There are too many such licenses in North Adams.  The board had talked over other locations and places where licenses might not be renewed due to the fact that there are too many in town.  It is the witness's policy, in accordance with his opinion, to decrease the number of such licenses . . . The witness thought there were two reasons why these two places should be denied licenses.  One was that they are right in the center of the city and there are already ample facilities to serve the public there; and the other is that they are the only two stores in which there are victualler's licenses which have been granted in the past, which carry on other business.  They would be for that reason, perhaps less seriously affected financially than the other stores which depend entirely on the dispensing of food for a living." The other respondent did not testify.  There was other evidence tending to show that the places of business of the petitioners in North Adams were kept in admirable condition and were in every way fit for the conduct of a restaurant.  But that evidence need not be narrated because the single justice was not bound to give it credence.

It is manifest that it might have been found that the action of the respondents in refusing to renew the licenses of the petitioners was due to a belief (1) that there were already too many licenses as common victualler in North Adams, (2) that it was detrimental to the public health to conduct the business of serving food as a common victualler in the same room where the sale of merchandise was carried on, (3) that the sanitary conditions of the places of business of the petitioners were not suitable for the preparation and sale of food to be eaten on the premises, and (4) that the methods of business of the petitioners had a tendency to lower the quality of food dispensed at restaurants in the city generally.  Doubtless it might have been found that there were other ancillary and contributing reasons which, while not sufficient to warrant denial of licenses to the petitioners, did not vitiate the action of the respondents.

The statute governing the conduct of the respondents touching the granting of licenses to persons to be common victuallers is G. L. (Ter. Ed.) c. 140, § 2. Its dominant words are these: "Licensing authorities may grant licenses to persons to be innholders or common victuallers . . . This section shall not require the licensing authorities to grant either of said licenses if, in their opinion, the public good does not require it . . . ." By § 20 of the same chapter, whoever assumes to be a common victualler without being licensed is made subject to a penalty. The meaning of this statute is to be determined by its words and its history. It was said in *Commonwealth* v. *Meckel*, 221 Mass. 70, at page 72: "The words 'common victualler,' in Massachusetts, by long usage, have come to mean the keeper of a restaurant or public eating house. Because of the nature of the business the keeper of such a place must be licensed by the proper authorities and is required by statute at all times to be provided with 'suitable food for strangers and travellers,' and to have 'upon his premises the necessary implements and facilities for cooking, preparing and serving food for strangers and travellers.'"

From the early days of the colony to the present, there have been statutory regulations concerning the licensing of common victuallers, innholders, and the sellers of intoxicating liquors. Vol. I, Records of Massachusetts, pages 140 and 213. Vol. I, Acts and Resolves of the Province of Massachusetts Bay, page 527 (1703–1704, c. 5). St. 1786, c. 68, § 2. It was said respecting these laws in *Commonwealth* v. *Blackington*, 24 Pick. 352, at page 355: "These laws in nearly the same form in which they are now found, were commenced soon after the Colony of Massachusetts was first founded, and were revised and amended from time to time, during the continuance of the colonial government; they were revised and reënacted soon after the grant of the new province charter, in 1692, and revised from time to time under the provincial government; and within a few years after the adoption of the present constitution, they were revised and reënacted, and with some amendments and modifications, have been in force ever since." In Gen.

Sts. c. 88, § 2, it was provided that the licensing authorities might grant licenses "to as many persons to be innholders or common victuallers in the several towns . . . as they think the public good requires . . . ." (See also Rev. Sts. c. 47, §§ 17, 18.) That section was not changed until the enactment of Pub. Sts. c. 102, §§ 2, 24, when the words "to as many persons" were omitted. The three eminent lawyers composing the commission charged with making that revision expressly stated that they had "not intended to change the substance of the law." Report of Commissioners on Revision of the Statutes, page 3. It is manifest that the omission of those words "to as many persons" wrought no change in the meaning of the section. It was a mere revision and consolidation of former statutes without any intent to depart from the meaning of the earlier acts. *Main* v. *County of Plymouth*, 223 Mass. 66, 69. *Neiss* v. *Burwen*, 287 Mass. 82, 96. *Hopkins* v. *Hopkins*, 287 Mass. 542, 547. The statutory provisions now found in G. L. (Ter. Ed.) c. 140, § 2, are in substance the same as those of the earlier statute covering the same subject. The licensing authorities are not now required to grant any licenses to common victuallers. Whether any such licenses shall be granted and, if any, the number to be granted rest in the sound judgment of the licensing board as to the demands of the public welfare in the respective communities. The requirement of the "public good" as the standard by which to measure the number of such licenses to be granted runs through the statutes on this subject for more than a. century. This is a valid police regulation. *Decie* v. *Brown*, 167 Mass. 290. *Calder* v. *Kurby*, 5 Gray, 597. It is sufficiently definite to be comprehended by persons of common understanding. *Kneeland* v. *Emerton*, 280 Mass. 371, 383–389. *General Outdoor Advertising Co. Inc.* v. *Department of Public Works*, 289 Mass. 149, 192–193. *United Billposting Co.* v. *Somerset County Council*, 95 L. J. K. B. 899.

The petitioners urge that the limitations in the earlier laws were permissible because, until the enactment of St. 1837, c. 242, § 2, a license to be a common victualler authorized also the sale of intoxicating liquor, and that such a

license is subject to regulations far more stringent than one to be a common victualler. (See St. 1875, c. 99, § 6, Fifth.) The sale of food for immediate consumption on the premises of the vendor has an intimate relation to the public health. *Friend* v. *Childs Dining Hall Co.* 231 Mass. 65. *Schuler* v. *Union News Co.* 295 Mass. 350. We think that the nature of the business of a common victualler affords basis for regulation as to the number of places to be licensed in any community. *Commonwealth* v. *Bennett*, 108 Mass. 27. *Commonwealth* v. *Fredericks*, 119 Mass. 199.

The terms of G. L. (Ter. Ed.) c. 140, § 2, as thus interpreted do not exceed the bounds of constitutional competency of the General Court to enact all manner of wholesome and reasonable laws under c. 1, § 1, art. 4 of the Constitution of this Commonwealth. Reason as well as historical considerations leads to this conclusion. *Opinion of the Justices*, 282 Mass. 619, 626–627. *Commonwealth* v. *S. S. Kresge Co.* 267 Mass. 145, 151. *Opinion of the Justices*, 286 Mass. 611, 617. *Commonwealth* v. *Kimball*, 24 Pick. 359.

The evidence already narrated warranted the single justice in finding that the places of business of the petitioners were unsanitary and not suitable for the preparation and sale of food. His general finding in favor of the respondents may have rested on that ground. It is too clear for discussion that such a finding would be ample justification for denial by the respondents of the applications of the petitioners for licenses. The single justice may also have found that it was detrimental to the public health to serve food for immediate consumption in the room where the sale of merchandise was in progress. The opinion was expressed in *In re Interrogatories of the Governor*, 97 Colo. 587, 595, 597, that a determination that "the preparation and service of meals, in the same room where the sale of merchandise is actively carried on, is inimical to the public health" could not be pronounced an unreasonable exercise of the police power. The single justice may further have found that the decision of the respondents was supported by the facts that too many places had been licensed for

public eating houses and that the welfare of the community would be promoted by diminishing that number, and that the methods of business of the petitioners conduced to impair the quality of food dispensed at all such places. It cannot be held that any of these findings was without support in evidence. Therefore the decision of the single justice in dismissing the petitions cannot be reversed. *Andrews* v. *Registrars of Voters of Easton*, 246 Mass. 572, 576. *Swift* v. *Registrars of Voters of Quincy*, 281 Mass. 271, 284. Each one of them appears to be a reasonable and nondiscriminatory test. No one of them appears to be designed to operate against the petitioners on grounds of prejudice, or whim, or caprice. The record does not show that the respondents were actuated by any unworthy motives. No inference of that nature is permissible in view of the action of the single justice in dismissing the petitions. The case at bar seems to us plainly distinguishable from *Yick Wo* v. *Hopkins*, 118 U. S. 356, and the numerous cases of that class following it. The business of conducting a public eating house is affected with a public interest. Holders of licenses as common victuallers are required on all secular days to supply food to a stranger or traveller without discrimination as to race or color. G. L. (Ter. Ed.) c. 140, § 8; c. 272, § 98. The history of the statutes in this Commonwealth shows common victuallers to be in the class with innholders as to public regulation. The business of a common victualler falls within the class which can be conducted only by authority of a public license with the duty of rendering public service, or within that exceptional class impressed with a public interest such as "the keepers of inns, cabs and grist mills." *Chas. Wolff Packing Co.* v. *Court of Industrial Relations*, 262 U. S. 522, 535. The number as well as the character of places devoted to that business has an intimate relation to the public health. The power of the General Court to regulate the business in all these particulars seems to us clear. It is not transcended by the present statute. The licenses sought by the petitioners were mere permissions and in no sense property. The petitioners had no right to a renewal of a

license. *Burgess* v. *Mayor & Aldermen of Brockton,* 235 Mass. 95, 100. They were entitled only to fair treatment.

The single justice granted a ruling requested by the petitioners to the effect that "To refuse to renew a common victualler's license to a petitioner, otherwise qualified, on grounds other than a failure to comply with G. L. (Ter. Ed.) c. 140, § 6, or other than because it has done or is doing business in an illegal or unsanitary manner is improper and illegal." This action indicates that he found that the refusal of the respondents to grant licenses to the petitioners was based on sound, practical grounds. The findings of the single justice can hardly be vitiated by error of law in view of that ruling. The single justice ruled in accordance with a request of the petitioners that "To refuse to grant or renew a common victualler's license to a petitioner otherwise qualified, on the ground that the petitioner does not pay local taxes on real estate, is improper and illegal." Having thus instructed himself as matter of law the action of the single justice in dismissing the petitions imports a finding that the respondents did not refuse to grant or renew a common victualler's license to the petitioners on the ground stated.

There was no error in the denial of the request to the effect that the respondents could not act according to their honest convictions of the requirements of the "public good" in granting or denying licenses. Those words are in the governing statute as stating the standard of conduct of the respondents. They are words in common use and convey an intelligible idea. The respondents would be derelict in their duty if they failed to consider the "public good" in passing upon applications for licenses.

The request that the respondents had no right to refuse to grant a license because they thought that there already were enough common victuallers in the city was denied rightly. The reasons have already been stated. The statute, according to its true interpretation, authorizes the respondents to decline to grant a license on that ground.

Numerous other requests for rulings to the effect that to refuse to grant a license on a stated ground was improper

and illegal were modified by the single justice by inserting the word "sole" before each stated ground and then were granted. The petitioners have no just ground of complaint in this particular. Of course this did not mean that all the facts together would justify a refusal to license when no one of them alone could have that effect. These requests related to separate and isolated facts. "A trial judge cannot be compelled to give a ruling upon the effect of a single disconnected fact. . . . This well established rule is not to be avoided by multiplying requests until they cover all the several material facts involved in a decision of the case." *Smith* v. *Import Drug Co.* 253 Mass. 368, 371. These requests need not be examined in detail. They are not pertinent to decisive aspects of the evidence. *Karlsberg* v. *Frank*, 282 Mass. 94. *Crowninshield Shipbuilding Co.* v. *Jackman*, 283 Mass. 21. *Marangian* v. *Apelian*, 286 Mass. 429, 437.

The decision on the petitions for writs of mandamus rests upon the ground in part that the provisions of G. L. (Ter. Ed.) c. 140, § 2, as to the granting of licenses to persons to be common victuallers, violate no rights guaranteed to the petitioners by the Constitution of this Commonwealth or by the Fourteenth Amendment to the Federal Constitution.

The principles of law already declared in deciding the petitions for writs of mandamus show that the allegations in the bills in equity, although in some respects more favorable to the plaintiffs than the facts stated in the bills of exceptions, and the grounds for relief there invoked, afford no support for a remedy for the plaintiffs in equity. It follows from this that the suits in equity cannot be maintained and the demurrers must be sustained. *Shuman* v. *Gilbert*, 229 Mass. 225, 229.

In each petition for a writ of mandamus the exceptions are overruled. In each suit in equity a decree may be entered dismissing the bill with costs.

*So ordered.*